[No. 12967. Department One. June 7, 1916.]

J. K. PARKER et al., Appellants, v. E. A. BRAINARD et al.,
Respondents.[1]

FRAUD—MISREPRESENTATIONS—DUTY TO INVESTIGATE — EVIDENCE—
SUFFICIENCY. Recovery for fraud in a trade in misrepresenting an
orchard tract is not warranted where it appears that, upon request
for a report, the tenant's wife made out answers to inquiries sub-
mitted, the defendant disclaimed knowledge thereof, and merely sub-
mitted the report for what it was worth; especially where each party
to the trade undertook to make his own investigation and the ex-
change was made after the time for the investigation had elapsed
and each had expressed himself as ready to make the exchange; the
property being at hand where it might have been investigated.

Appeal from a judgment of the superior court for King
county, Humphries, J., entered January 16, 1915, upon find-
ings in favor of the defendants, in an action for damages
for fraud, tried to the court. Affirmed.

S. H. Kelleran, for appellants.

O. E. Sauter and William L. Waters, for respondents.

FULLERTON, J.—This is an action for damages for al-
leged fraudulent representations upon an exchange of lands,
brought by one of the parties against the other. The real
estate broker who effected the trade was also made a party
defendant on the ground of fraudulent representations on his
part.

The plaintiff J. K. Parker had placed in the hands of
J. C. Oliphant, a real estate broker, a fifty-acre ranch in
Kitsap county for purposes of sale, and defendant E. A.
Brainard had likewise placed with the same dealer a ten-
acre ranch in Benton county for a like purpose. Both of
the parties were residents of Seattle, Washington. After
the properties had been on Oliphant's lists for some months,
he conceived the idea of getting the parties to exchange

[1]Reported in 157 Pac. 1078.

their holdings, and to that end brought them together at his office some time in March, 1914. On the 28th of that month, a preliminary agreement was entered into between Parker and Brainard for the exchange of the properties, Parker adding to the Kitsap ranch five acres located in Pierce county, subject to a $75 mortgage, and also $125 cash. The agreement contained the following clause:

"It being understood that five days from date will be allowed for each to investigate and see the property offered, and, if found satisfactory to both that the deal will be closed in the office of Oliphant & Co. not later than April 2d."

It appears from the evidence that neither of the parties went to view the lands involved. On the fifth day of the period allowed for investigation, Parker called up Oliphant and told him that he was ready to close the deal. Oliphant notified Brainard, and the parties accordingly met at Oliphant's office on that day, April 2d. At this time Brainard objected to the Pierce county land as not satisfactory, and a modified agreement was made, substituting in place of the Pierce county land and $125 cash, $200 cash and a mortgage for $600 to be given back to Brainard on the Benton county ranch. The following day was fixed for closing the deal, at which date the exchange was finally effected. It was the understanding that Oliphant represented both sides in the deal, and each agreed to pay him a commission of $100. There were no values placed upon the respective properties by the parties; Parker merely agreeing to exchange his fifty-acre ranch, incumbered with a $1,800 mortgage, and pay virtually $800 cash additional, for Brainard's contract for the Benton county ranch, on which there was $800 due. In other words, plaintiff assumed a $1,600 indebtedness as against $1,800 assumed by Brainard.

The evidence tended to show that the Kitsap property was worth no more than the amount of the mortgage upon it, and that the Benton county property was not worth more than $1,250 or $1,500, less the sum due on contract.

Brainard had never seen his own property, and had no actual knowledge of its condition, and so told Parker. Oliphant had seen the ranch about a year before, and he told Parker that, at that time, the fruit trees were all in healthy condition. He also supplied Parker with a list of questions which he had submitted to a tenant on the property, with the answers returned. We set them out in full, as they form the basis for the fraud asserted by plaintiff.

"We want information as follows for a prospective buyer, as to the present condition of place, and will thank you for filling out the same as outlined, giving your views and knowledge of the ranch. Orchard, are trees in good condition? Yes in good condition, these grew about 3 ft this year. About what was raised on the place this season? About 25 boxes of peaches on eight trees; some apricots and cherries. I don't know as these was gathered before I come. Were the potatoes of good quality, and about what did they average, as would consist per acre? Good quality and about 200 bushel to the A. Were the grapes bearing this season? Yes. Are the vines in good condition? Yes. What would they average as to tonage? 3 Ton to A. In your opinion, what do you think of the place? Pretty good. All it needs is attention for 1 year. It would raise anything. It has good strawberry ground on it. About what sum would be necessary to put place in a fair condition? About $200 would put in good condition to seed and fix up the ten A. Where should money be applied to best advantage? I should have 10 loads of manure, or sow to vetch one fall and turn under, then sow to alfalfa."

To this was appended a schedule enumerating the fruit trees and berry bushes, as follows: 6 plum, 21 peach, 5 apricot, 261 apple, 12 cherry, 6 crab apple, 6 pear, 598 grape vines, 6 quince, 25 raspberry, 25 blackberry, 12 currant, 12 gooseberry.

This report on the place was understood to have been given by the man in charge, but was in fact made out by his wife without his knowledge, and differed materially from his evidence as given in behalf of plaintiffs. It was explained, how-

ever, that the tenant was frequently away from home, and
that it had been the custom between them for his wife to
open and answer his letters.   This statement from the ten-
ant was placed in Parker's hands and doubtless was largely
influential in inducing him to make the trade.   But it was
given to him for what it was worth, was not vouched for by
either Brainard or Oliphant, and seems to have been an
honest effort on the part of Oliphant to get a reliable report
on the condition of the property.   Oliphant told him that,
when he was on the place the year before that, there were
five or six acres in fruit trees, which were just beginning to
leaf out, and that the place was then in fairly good condi-
tion.   This is supported by the testimony of another witness,
Chapman, to the effect that the orchard was in good con-
dition in June, 1913.   The evidence discloses that a year
later than Oliphant's visit the ranch was not up to the stand-
ard represented by the statement of the tenant shown to
Parker.

We agree with the trial court that there was here no such
evidence of fraud as will justify a recovery.   The representa-
tions of the tenant were neither the representations of Brain-
ard nor the representations of Oliphant, nor were they given
Brainard for the purpose of inducing him to, or with the
expectation that he would, rely upon them.   It was a part
of the agreement that an investigation should be made by
the parties, and five days' time, which was deemed sufficient,
was allowed for that purpose.   This, to our minds, does not
present a case of reliance upon representations.   Each party
undertook to make his own investigation, and the exchange
was made after the time fixed for the investigation had
elapsed and after each had announced his readiness to make
the exchange.   Nor does it present a case of property at a
distance not expected to be examined, where reliance may be
justly placed upon representations as to its condition and
character.   On the contrary, the situation of the parties
brings the question within the principles announced in *Pigott*

*v. Graham*, 48 Wash. 348, 93 Pac. 435, 14 L. R. A. (N. S.) 1176, and *Stewart v. Larkin*, 74 Wash. 681, 134 Pac. 186, L. R. A. 1915 B. 1069.

In the first case cited, we said:

"It must not be forgotten that the contracting. parties were dealing at arm's length. No fiduciary relations existed between them—nothing to inspire confidence or disarm suspicion—and there was no imbecility of age, weakness or disease. The property in question was at hand, and an inspection of it by the defendants could have been made had they insisted upon it. The representations related solely to quantity, quality and value, the truth, or falsity of which could have been determined by an inspection. Under such circumstances, we think it will not do to hold that a party may successfully complain of his own failure to exercise ordinary care, prudence, and caution, when, by the exercise thereof, the injury of which he complains could not have arisen." *Griffith v. Strand*, 19 Wash. 686, 54 Pac. 613.

In the second case cited, it is said:

"It has always been the law that where the parties deal as strangers and the means of knowledge are equally available and the lands subject to the inspection of the purchaser, and he avails himself of the opportunity of inspection afforded him, he cannot be heard to say that he has been deceived, even though the truth has been withheld from him or the facts misrepresented, as the true facts are as available to him and as much within his knowledge as that of the one with whom he deals."

The evidence discloses that there was no fiduciary relation existing between the parties, and that they were intelligent business men, dealing with one another at arm's length. It does not show that there was any serious discrepancy in the values of the property exchanged. In fact the trial court found:

"That the reasonable market value of the consideration given by plaintiffs to defendants Brainard in the said exchange was less than the reasonable market value of the property received by the plaintiffs from defendants Brainard."

The view we have taken of the case in respect to the lack of fraudulent representations on which appellants may found an action for damages renders it unnecessary for us to consider their objection to the theory of damages applied by the trial court and the admission of evidence supporting such theory.

The judgment is affirmed.

MORRIS, C. J., MOUNT, CHADWICK, and ELLIS, JJ., concur.